Filed 7/21/25  P. v. Kelly CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B330835 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA155756) |
| v. | |
| DARNELL KELLY, | ORDER MODIFYING OPINION |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on July 14, 2025, is modified as follows:

On the caption page, delete "DIVISION ONE" and replace it with "DIVISION FIVE".

There is no change in judgment.

_____
HOFFSTADT, P. J.          BAKER, J.          KIM (D.), J.

Filed 7/14/25  P. v. Kelly CA2/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>DARNELL KELLY,<br><br>        Defendant and Appellant. | B330835<br><br>(Los Angeles County<br>Super. Ct. No. TA155756) |

        APPEAL from a judgment of the Superior Court of the County of Los Angeles, Allen J. Webster, Jr., Judge.  Affirmed, in part, reversed, in part, and remanded with instructions.

        Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

Defendant Darnell Kelly appeals from his convictions for second degree murder and possession of a firearm by a felon, arguing that the trial court's erroneous self-defense instruction and improper admission of a photograph violated his right to a fair trial. He also contends that the prosecutor engaged in misconduct that violated his due process rights and the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1; Pen. Code, § 745[1]; the Act). And, he maintains that his conviction for being a felon in possession of a firearm violated the Second Amendment and his upper term sentences on that count and on a sentencing enhancement were unauthorized. We affirm, in part, reverse, in part, and remand with instructions.

# II. FACTUAL BACKGROUND

## A. *Prosecution's Evidence*

On the evening of September 24, 2021,[2] the murder victim, Dominique Moore, drove Precious Colbert and Khristen Williams to a birthday party in Gonzaque Village (also referred to as the "Haciendas" or "Hacies"), a housing development claimed by the Hacienda Blood gang. Williams, Moore, and Colbert had been drinking alcohol earlier in the evening and were "already drunk"

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The shooting took place in the early morning hours of September 25, 2021.

2

by the time they arrived at the Haciendas, where people were interacting and getting along outside.

Colbert engaged in a friendly conversation with someone who was seated in a red sedan but then began arguing with that person's brother. Moore wanted to leave because she was irritated with Colbert's intoxicated and belligerent behavior. Williams and Moore tried to calm Colbert down, but she persisted in being loud and refused Williams's directions to go to Moore's car.

At that point, defendant approached Colbert and told her she had to leave the Haciendas. She responded, "[F]or what, like it's good, ain't nothing going on." Defendant told Colbert to leave at least two more times. As Colbert continued to talk to defendant, he pushed her. Moore, Colbert, and Williams began walking away from the location toward Moore's car with their backs toward defendant.[3]

Defendant followed Moore and her two companions as they walked to their car. A woman, known as "Hollywood", then approached defendant, and he responded by striking her, after which she walked back to her vehicle and entered it.

When Williams, Moore, and Colbert arrived at Moore's car, Colbert saw defendant holding a gun by his side. As depicted in surveillance video, defendant continued walking toward Williams and Colbert, who were at the passenger side of Moore's car, while Moore stood on the driver's side. Defendant then moved to the driver's side of the vehicle and extended his right arm toward Moore's head as she leaned back on her car. A man attempted to

---

[3]     Williams told a detective that, as he was walking toward the victim's car after defendant told them to leave, he noticed defendant "clutch[ing] the gun."

3

restrain defendant, who responded by pushing him away. Williams, who had moved to the driver's side of Moore's car, motioned to a group of males standing nearby, and they ran toward Moore's car. One of them stepped between defendant and Moore and separated them at arms length. Defendant then shot Moore while she was still standing at the driver's side of her car. Moore moved from the driver's side and ran away from defendant, who shot Moore two more times as she fled. Moore collapsed, and Williams and Colbert ran to her.

Moore had been shot in the neck, the fatal injury, and also in the elbow and thigh. Based on the stippling around the wound site, the fatal round was fired while the gun's muzzle was between 10 to 24 inches from the victim.

Williams testified that, earlier in the evening, Moore showed him a gun that she kept in her purse. Colbert testified that neither she nor Moore were armed on the evening of the shooting, and the videos did not depict Moore holding a gun. The police did not find a gun on Moore's body, near the scene, or in her car.

B.    *Defense Evidence*

Defendant testified that he grew up in the Haciendas, in territory claimed by the Hacienda Blood gang. He was a member of that gang.

He knew from social media that Moore was a member of the Denver Lane Blood gang, but maintained that there was no rivalry between that gang and the Hacienda Bloods. He did not know Moore personally before the shooting and had no animosity toward her.

4

On the night of the shooting, defendant was armed with a gun. Although he was a convicted felon and prohibited from possessing a firearm, he admitted that he routinely carried a gun for protection against rival gang members. It was not uncommon for people who grew up in the Haciendas to carry guns.

Defendant went to the Haciendas during the day on September 24, 2021, as was his routine. He was unaware that Moore, Colbert, or Williams would be there that night and he had no intention of interacting with them. But when he observed an altercation, he decided to intervene to keep it from escalating and protect the neighborhood from a fight or a shooting and unwanted attention from the police.

The night of the shooting, after observing Colbert's belligerent behavior, defendant approached Williams and asked, "'What's going on?'" Williams replied, "'Nothing right now. . . . [J]ust trying to chill her out real fast.'" At that point, defendant intended to walk away, until he heard Colbert say she was "not going [nowhere], you bitch ass [racial slur]." Defendant replied, "'Yes, you [are].'" Defendant then pushed Colbert to prevent her from "getting in [his] face." He also exchanged words with Colbert and told Williams to take control of her. But he had no interaction up to that point with Moore.

When they began to leave, defendant followed behind Moore, Colbert, and Williams to ensure that they got into their car. Williams looked back at defendant repeating, "'We got her'", but Colbert kept saying, "'What? You bitch ass [racial slur]. What?'" As he was following the group, defendant saw Moore "messing with her shirt" and assumed she had a gun, but he did not see one at that point.

5

One of defendant's friends, Hollywood, approached, grabbed him, and asked what was going on. Defendant then temporarily moved behind a building, outside the view of the security cameras, and talked with Hollywood. But when he noticed that Moore, Colbert, and Williams had not yet left, he approached them again, and Colbert yelled, "'Old punk ass [racial slur].'" Defendant walked to the sidewalk where Colbert was standing and said, "'What [did] you say?'" He had a gun at that point in the front pouch of his "hoodie," but did not pull it out and had no intention of using it.

Hollywood again approached defendant and said, "'What's going on? What are you doing?'" He replied, "'Get out my face'" and "shoved her out [of his] face."

Defendant then approached Williams and told him to leave. Moore interjected, "'We finna leave. We finna leave. We finna leave.'" Defendant responded that they should have already left. Moore replied, "'Man who [are] you?' Like, 'you ain't nobody either.' 'Like, you saying I ain't nobody. You ain't nobody.'"

As defendant continued arguing with Moore, he saw her holding a black semiautomatic handgun by her right side. He denied that he pointed a gun at her as she leaned back on her car, explaining instead that he was pointing his finger at her while saying, "'Bitch, shut up.'" Moore responded, saying, "'You bitch ass, you better back up. You better back up.'" Williams again intervened saying, "'Hold on. Hold on.'"

Defendant asked Moore what she was going to do, and she replied, "'You better get back.' . . . 'You better get back.'" Defendant "wasn't scared of her" and "wasn't backing down." Other persons tried to intervene at that point saying, "'[H]old on. What's going on? Hold on.' . . . '[B]ack up.'" Defendant then

6

heard and saw Moore rack her gun and believed she was about to use it.  He pulled out his gun and fired once.  He fired a second shot because Moore still had a gun.  And, when defendant saw Moore turn to face him, he believed she was about to shoot and fired a third shot.  He fled the scene to avoid being arrested for discharging his weapon.

## III.   PROCEDURAL BACKGROUND

In a second amended information, the Los Angeles County District Attorney (District Attorney) charged defendant with the willful, deliberate, and premeditated murder of Moore in violation of Penal Code section 187, subdivision (a)[4], and section 189, subdivision (a) (count 1); and with being a felon in possession of a firearm in violation of section 29800, subdivision (a)(1) (count 2).  The District Attorney alleged as to the murder count that defendant personally used a handgun within the meaning of section 12022.5, subdivision (a).  The District Attorney further alleged that defendant had suffered two prior serious or violent felony convictions within the meaning of sections 667, subdivisions (b) through (j) and 1170.12, subdivision (b).

Following trial, the jury found defendant guilty of second degree murder and being a felon in possession of a firearm and found true the personal use allegation.  The trial court sentenced defendant to an aggregate term of 40 years to life on count 1, comprised of a base term of 15 years to life, doubled for the strike priors, plus an additional 10-year term based on the personal use

---

[4]     All further statutory references are to the Penal Code unless otherwise indicated.

7

allegation. On count 2, the court imposed an upper term, three-year sentence, to run concurrently with count 1.

Defendant timely filed a notice of appeal.

## IV. DISCUSSION

### A. *Delivery of CALCRIM No. 3472*

Defendant contends that the trial court violated his due process rights to a fair trial by delivering CALCRIM No. 3472, "Right to Self-Defense: May Not Be Contrived." The court instructed, "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." According to defendant, the court was required to modify sua sponte the pattern instruction by adding language informing the jury that "'a person who provokes a fight with an intent to use nondeadly force regains the right to self-defense when his or her opponent counters with deadly force[.]'" Without this modification, defendant asserts, the pattern instruction incorrectly stated the law.

#### 1. Standard of Review and Legal Principles

"'We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on whether the trial court "fully and fairly instructed on the applicable law.'" (*People v. Ramos*[ (2008)] 163 Cal.App.4th [1082,] 1088.) The trial court 'has a duty to give instructions on the general principles of law governing the case, even though not

8

requested by the parties, but it need not instruct on specific points developed at the trial unless requested.' (*People v. Wade* (1959) 53 Cal.2d 322, 334.)  Generally, 'it is enough for the court to instruct [on the elements of a crime] in the language of the statute when the defendant fails to request an amplification thereof.' (*People v. Failla* (1966) 64 Cal.2d 560, 565.)" (*People v. Turner* (2019) 37 Cal.App.5th 882, 887.)

  2. <u>Analysis</u>

  The instruction at issue here, CALCRIM No. 3427, accurately stated the law as set forth by our Supreme Court in *People v. Enraca* (2012) 53 Cal.4th 735 at page 761 (*Enraca*). (See *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334 [citing *Enraca* and concluding that the "instruction is a correct statement of law"].)  Nonetheless, relying on *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), defendant contends that the facts here supported an exception to the general rule stated above, that this is, "the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." (*People v. Eulian, supra*, 247 Cal.App.4th at p. 1334.)  We disagree.

  The defendants in *Ramirez, supra*, 233 Cal.App.4th 940 were two gang member brothers who recruited a fellow gang member to join them in confronting and fighting a rival gang member who had been harassing them. (*Id.* at p. 944.)  The defendants intended to provoke only a nondeadly fistfight with rival gang members, but when one of the defendants saw a rival member with an object he believed to be a gun, that defendant

9

produced a gun and killed the rival gang member. (*Id.* at pp. 944–945.)

The trial court in *Ramirez, supra*, 233 Cal.App.4th 940 instructed the jury with CALCRIM No. 3472, and during closing argument, the prosecutor repeatedly highlighted the instruction, arguing that it prevented defendants from relying on self-defense if they "'created the circumstances to begin with,'" regardless of whether the rivals had a gun or used deadly force. (*Id.* at p. 946.) "Indeed, the prosecutor acknowledged the evidence reflected a fistfight as defendants' likely intent: 'Nothing about the way that they approached, what they said, what they did, indicated anything but expecting and wanting a fight with the [rival gang]. [¶] I am not saying expecting and wanting murder. I am saying expect[ing] and wanting a fight.'" (*Ibid.*) The prosecutor continued, "'But remember, we are talking about *are they entitled* to self-defense if they went there *intending to provoke a fight and use force*? And if you find that they did, they are not entitled to that protection.'" (*Ibid.*)

The majority opinion in *Ramirez, supra*, 233 Cal.App.4th 940 reversed the defendants' murder convictions concluding that the delivery of CALCRIM No. 3427 was improper under the circumstances because it "made no allowance for an intent to use only nondeadly force and an adversary's sudden escalation to deadly violence." (*Id.* at p. 945.) The court explained that "[a] person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby 'forfeit[] . . . his right to live'" if the victim unexpectedly responds with deadly force. (*Id.* at p. 943.) According to the court, the instruction as phrased "make[s] no distinction between deadly and nondeadly force, nor an

10

opponent's escalation to deadly force.  The distinction makes all the difference." (*Id.* at p. 953, fn. 2.)

Unlike the facts in *Ramirez, supra*, 233 Cal.App.4th 940, the evidence here was insufficient to support a reasonable inference that defendant had set out to engage in a fistfight with rival gang members.  Indeed, it was uncontroverted that defendant did not know Moore before the altercation and was unaware that Moore, Williams, and Colbert would be at the party at the Haciendas.  Defendant also admitted that he was at all times armed with a gun that night and assumed Moore was armed, yet nevertheless continued to follow Moore, Colbert, and Williams to reengage them, stating he was not afraid of Moore and was not going to back down from her.  Thus, there was no evidence that would have supported an inference that defendant's initial intention in intervening with the trio and then reengaging with them was only to provoke a non-deadly confrontation.

Further, although the prosecutor repeated the instruction in CALCRIM No. 3427, he did not, like the prosecutor in *Ramirez, supra*, 233 Cal.App.4th 940, concede that defendant originally contrived to start a fistfight.  Moreover, defense counsel emphasized that the evidence did not support a theory of contrivance.  As to CALCRIM No. 3427, defense counsel explained, "I can't start the fight with intent to use force, as a means of using force.  So I can't start a fight with one of you with the idea that I want you to fight back so that I can then use force against you.  But that's not this case."  Counsel explained that there was no indication that defendant intended to use *any* force against Moore until she purportedly brandished a gun.  Given

11

these facts, we conclude the trial court did not err in delivering CALCRIM No. 3427.[5]

B.      *Violations of Due Process Right to a Fair Trial*

Defendant raises multiple due process challenges to the fairness of his trial based on the trial court's admission of evidence and the prosecutor's conduct during witness examinations and argument.  We address each challenge below.

1.      Trial Court's Admission of Photograph of Defendant

During his direct examination of Los Angeles Police Department Detective Michael Levant, the prosecutor sought to introduce exhibit 45, which was a photograph that investigators found on defendant's phone.  The photograph showed a shirtless defendant, smoking and standing behind a counter or table on which a bottle of alcohol and gun had been placed.  Defense counsel objected to the photograph, arguing it was not relevant because defendant did not dispute that he was armed and that it was unduly prejudicial.  The trial court overruled the objection and admitted the photograph.

We review the trial court's evidentiary ruling for an abuse of discretion.  (*People v. Karis* (1988) 46 Cal.3d 612, 637.)  Defendant argues that the admission of the exhibit was an abuse of discretion because it was not relevant to either of the counts

---

[5]      Because we conclude the court did not err in delivering the jury instruction, we need not consider defendant's alternative argument that counsel was ineffective in failing to object to the instruction.

charged and was otherwise more prejudicial than probative under Evidence Code section 352.[6]

We will assume, without deciding, that the trial court abused its discretion by admitting exhibit 45, but conclude that any such assumed error was harmless. The photograph depicted defendant posing shirtless with a gun and suggested to the jury that he was familiar with and comfortable around deadly weapons. But defendant's own testimony established that even though he was a convicted felon prohibited from carrying a firearm, he routinely carried one for protection and was armed with a handgun on the night of the shooting. Thus, the exhibit could not have had an effect on the verdict. Given the other

---

[6] For the first time on appeal, defendant contends that the trial court's admission of the photograph also violated Evidence Code section 352.2. That code section sets forth additional criteria that a trial court must consider when the evidence sought to be admitted qualifies as "a form of creative expression" under the statute, including specifically whether it has factual detail not otherwise publicly available and whether it creates the possibility that the trier of fact will treat the expression as evidence of the defendant's propensity for violence or general criminal disposition, as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings. (Evid. Code, § 352.2.) Because those matters were not presented and argued to the trial court, defendant has forfeited his challenge to the photograph under that code section. (*People v. Partida* (2005) 37 Cal.4th 428, 435 (*Partida*) ["the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct"].)

strong evidence of defendant's guilt, including the surveillance video depiction of defendant's conduct leading up to and during the shooting—which was supported by the testimony of the eyewitnesses and the investigator concerning the depicted events—defendant cannot establish prejudice.

We also reject defendant's related argument that the admission of the exhibit deprived him of his constitutional right to a fair trial. "'The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.'" (*Partida, supra*, 37 Cal.4th at p. 439.) We find no due process violation here.

### 2. Prosecutorial Misconduct

Defendant advances five categories of purported prosecutorial misconduct which are based on conduct during the trial to which defendant did not object. He has therefore forfeited those challenges by failing to preserve them in the trial court. "[T]o preserve a claim of prosecutorial misconduct for appeal, "'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety.'" [Citation.] The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' [Citation.]" (*People v. Hoyt* (2020) 8 Cal.5th 892, 942–943 (*Hoyt*).)

14

### a. Admission of Photo

Defendant contends that the prosecutor's conduct in submitting and successfully arguing for the admission of exhibit 45, the photograph, constituted prejudicial misconduct. But as noted above, his objection to the admission of the exhibit was based solely on evidentiary grounds. He did not suggest or imply to the trial court that the prosecutor was engaged in misconduct. Nor did he request an admonition. Defendant therefore cannot pursue his challenge on appeal. (See *People v. Romero* (2008) 44 Cal. 4th 386, 411 ["The reason for this rule is to allow errors to be corrected by the trial court and to prevent gamesmanship by the defense"].)

In any event, the prosecutor's use of the photograph did not constitute misconduct warranting reversal. ""A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'""" (*People v. Powell* (2018) 6 Cal.5th 136, 172.) We have concluded above that defendant was not prejudiced by the admission of the exhibit. The prosecutor's use of the photograph therefore did not render defendant's trial fundamentally unfair or involve deceptive or reprehensible methods.

15

## b.     Violations of the Act

Defendant next contends that the prosecutor engaged in misconduct when he used "racially coded" and "disrespectful" language toward defendant in violation of the Act[7] and defendant's due process rights to a fair trial. He maintains that the prosecutor's use of terms such as "your boy," "homies," and "homegirl" were racially discriminatory and his use of the term "piss" when cross-examining defendant was disrespectful. To the extent these misconduct claims are grounded in the due process clause, defendant's failure to object to them on federal constitutional grounds forfeited any such claim on appeal. (See *United States v. Olano* (1993) 507 U.S. 725, 731 ["'[n]o procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it'"].)

Moreover, although a claim under the Act "based on the trial record" may be "'raise[d] . . . on direct appeal from the

---

[7]     "In 2020, the California Legislature enacted the Racial Justice Act (Stats. 2020, ch. 317, § 3.5), which went into effect on January 1, 2021. Its declared intent is 'to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California. Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias.' (Stats. 2020, ch. 317, § 2, subd. (i.).)." (*People v. Singh* (2024) 103 Cal.App.5th 76, 109 (*Singh*).)

conviction or sentence'" (§ 745, subd. (b)), a defendant's failure to timely raise a claim under the Act at trial results in a forfeiture of that claim. (*Singh, supra*, 103 Cal.App.5th at pp. 114–115; *People v. Lashon* (2024) 98 Cal.App.5th 804, 810.) Because defendant's trial occurred in March 2023, he had the opportunity to raise the Act during his trial. His failure to do so therefore forfeits the claim on appeal.

### c. Appeal to Gendered Stereotypes

Defendant asserts that "[t]he prosecution's invocation of gender biases and stereotypes, by, for example, using infantilizing language towards women also had no place in our courtroom." Focusing on the prosecutor's repeated use of the term "petite girl", he accuses the prosecutor of "ask[ing] the jury to see the women in this case as child victims who could not have reasonably posed any threat to [defendant]."

At no time during trial did defendant object to the prosecutor's use of the term "petite girl". Nor did he object that the prosecutor was engaging in misconduct by using that term. He therefore forfeited any claim on appeal based on such alleged misconduct. (*Hoyt, supra*, 8 Cal.5th at pp. 942–943,)

### d. Appeal to Sympathy for Victim

Defendant next contends that the prosecutor "broke [what] is known as '"The Golden Rule'" in closing argument" by inviting "'the jury to put itself in the victim's position and imagine what the victim experienced'" in "'a blatant appeal to the jury's natural sympathy for the victim.'" According to defendant, "[p]lacing the

17

jury directly into . . . Moore's position and telling them they should only acquit [defendant] if they would (personally) be fine having been her in this scenario broke [that rule]."  As with his other assertions of misconduct, this claim has been forfeited on appeal by defendant's failure to object during argument and request a curative instruction.  (*Hoyt, supra*, 8 Cal.5th at pp. 942–943.)

A timely objection in this instance would have allowed the trial court to admonish the jury that appeals to sympathy should be disregarded and that the case should be decided solely on the facts.

### e.      Appeals to Social Norms

Finally, defendant asserts that the prosecutor improperly argued that the jurors should decide whether defendant was guilty based upon desired "societal norms", not the law as properly interpreted.  According to defendant, the prosecutor misstated the law on self-defense and "improperly suggested to the jury that the prosecution did not need to *prove* lack of perfect or imperfect self-defense; the prosecutor merely needed to prove [defendant] was the provocateur and then the jury was free to convict [defendant] if they felt his behavior did not reflect how 'reasonable normal people should live.'"

Because defendant did not object on these grounds in the trial court, this claim of misconduct suffers from the same forfeiture problem as his other claims.  (*Hoyt, supra*, 8 Cal.5th at pp. 942–943.)  But even if we were to consider the merits of the claim, we would reject it.  "[O]rdinarily 'a prosecutor may not invite the jury to view the case through the victim's eyes, because

18

to do so appeals to the jury's sympathy for the victim.'" (*People v. Lopez* (2008) 42 Cal.4th 960, 969–970.)  Here, the prosecutor did not improperly appeal to the jury's sympathy for the victim.

Instead, toward the end of his argument, the prosecutor asked rhetorically, "Is this a society that you can hear allegedly . . . a racking of a gun . . . and based upon a sound, not knowing the person, not even seeing a weapon, is that the society we live in based upon that sound you can justifiably kill somebody?  *I have an excuse to kill you because I heard a click, click.*  If that's the case, acquit him.  Walk him.  Not guilty.  Not guilty." (Italics added.)

Read in context, the prosecutor's use of the pronoun "you" in the phrases, "Is this a society that *you* can hear . . . a racking of a gun", "*you* can justifiably kill somebody" and "I have an excuse to kill *you*", was not a direct invitation to the jurors to stand in the shoes of the victim.  Instead, the prosecutor was employing the pronoun in the indefinite or impersonal sense, as a colloquial or less formal version of the generic "one" or "someone." Under that grammatical construct, the argument suggested, albeit in dramatic terms, that a reasonable person in modern society would not have reacted to the sound described in defendant's testimony in the manner defendant claimed he reacted.  (*People v. Nadey* (2024) 16 Cal.5th 102, 186 [The use of colorful or hyperbolic language will not generally establish prosecutorial misconduct].)  It neither misstated the law of self-defense nor violated the golden rule.  Accordingly, the prosecutor's argument did not constitute misconduct.

19

### 3. Ineffective Assistance of Counsel

Defendant alternatively argues that his trial counsel's failure to object to the foregoing instances of alleged prosecutorial misconduct, as either violations of due process or the Act, constituted ineffective assistance of counsel.

""" "A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.]"" " (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1088.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Contrary to defendant's portrayal of the prosecutor's word choices and arguments during the trial, we observe that much of the prosecutor's "colorful or hyperbolic" usage can be characterized as a fair comment on the evidence. For instance, witness Danetta Rancifer first introduced the term "homie" into the trial and she defined it. She also used the term "boy" in reference to the other male who drove with her and defendant to a hotel earlier in the evening. Thereafter, defendant himself used the terms "homie", "homegirl", and "hoodie" on occasion and

20

he also appeared to adopt the prosecutor's use of the terms in certain of his answers to the questions that contained them. Similarly, the term "girl" was first used by Rancifer, when referring to Hollywood. Thereafter, defendant first used the term "petite" when describing Colbert's size. The prosecutor then adopted both terms when repeatedly referring to Colbert as the "petite girl", apparently for the purpose of emphasizing the size disparity between defendant and Colbert.

But even assuming that the prosecutor erred, the record supports a finding that counsel had a rational purpose in failing to object. Counsel may have concluded that the prosecutor's use of colloquial language supported defendant's argument at trial that the Haciendas was a dangerous neighborhood, populated by gang members who carried guns, and thus defendant acted in self-defense when he shot Moore. Indeed, defense counsel cited to the prosecutor's use of the term "petite little girl" and contrasted that term with the video and testimonial description of Colbert's conduct. Defense counsel argued, "This petite little girl, if you watch the video, she is the most aggressive, petite little girl you will ever see. She fights with Kristen Williams." Defense counsel also used the depiction to note that, if defendant intended to kill, he would have shot Colbert, who was belligerent, rather than Moore. Similarly, in response to the prosecutor's polite society comments, counsel emphasized the importance of the testimony regarding the prevalence of guns and violence in the Haciendas. "And [the prosecutor] would have you believe that this is not the kind of society that we want to live in. And I don't. . . . I live in a nice neighborhood where if I saw [defendant] walking down the street with a gun, Torrance police would arrest him in a second. Not a question about it. [¶] He doesn't live in that neighborhood.

21

He lives in this neighborhood. He lives in the Hacies. A place that . . . Colbert told you has guns all the time. A place that [defendant] told you has guns all the time." Counsel continued, "And you ask yourself, if this was the world you lived in, is it okay to carry a gun? And it might be. So when we're talking about polite society, keep in mind, we're not in polite society in this world."

### 4. Cumulative Error

Defendant maintains that the "cumulative impact of the prosecutorial error, combined with the related evidentiary error, demands a reversal of [defendant's] conviction for second-degree murder. To the extent defense counsel is at fault for all or part of this pattern of error, then counsel's omissions, alternatively, compel the same result." We disagree.

We have found that defendant was not prejudiced by any assumed error in admitting exhibit 45 and defendant has failed to demonstrate any prosecutorial error, evidentiary error, or deficient performance by his trial counsel. Thus, there is no multiple effect of cumulative error. (*People v. Williams* (2013) 56 Cal.4th 165, 201; *People v. Sapp* (2003) 31 Cal.4th 240, 316.)

### C. *Second Amendment Violation*

Defendant argues that his conviction for being a felon in possession of a firearm under section 29800 violated his Second Amendment right to self-defense. In support of his contention, defendant relies almost exclusively on *United States v. Duarte* (9th Cir. 2024) 101 F.4th 657 (*Duarte*) and its interpretation of

the Supreme Court's decisions in *New York State Rifle & Pistol Assn. v. Bruen* (2022) 597 U.S. 1 (*Bruen*) and *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*). According to defendant, "like the sweeping federal ban at issue in *Duarte*, California's sweeping ban, embodied in section 29800, is unconstitutional as written." Defendant also contends that section 29800 is unconstitutional, as applied in this case, because "the evidence produced at [defendant's] trial [was] insufficient to establish [that he] violated the law, as modified by Second Amendment jurisprudence."

### 1. Facial Validity of Section 29800

On July 17, 2024, after defendant filed his opening brief based on *Duarte, supra*, 101 F.4th 657, the Ninth Circuit granted rehearing en banc and vacated that decision. (*United States v. Duarte* (9th Cir. 2024) 108 F.4th 786.) "'[A] decision that has been vacated has no precedential authority whatsoever,' *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n. 2 (9th Cir. 1991) . . . ." (*Marley v. U.S.* (9th Cir. 2009) 567 F.3d 1030, 1038 [quoting 47 Am. Jur.2d (2009) Judgments, § 714 ['"When a judgment has been rendered and later set aside or vacated, the matter stands precisely as if there had been no judgment'"].) Because *Duarte, supra*, 101 F.4th 657 is no longer persuasive authority, defendant's legal argument is largely unsupported, but for his citations to *Bruen, supra*, 597 U.S. 1 and *Heller, supra*, 554 U.S. 570. And, recent California authority has concluded that section 29800 is facially valid under the rationale of those decisions. (*People v. Anderson* (2024) 104 Cal.App.5th 577, 582 ["We conclude that the [felon-in-possession] statutes [the defendant]

23

challenges are constitutional, as they are 'consistent with the principles that underpin' this nation's 'regulatory tradition.' [Citations.]"]; *People v. Alexander* (2023) 91 Cal.App.5th 469, 479; *People v. Ceja* (2023) 94 Cal.App.5th 1296, 1301; *People v. Odell* (2023) 92 Cal.App.5th 307, 316–317.) We reach the same conclusion here and hold section 29800 is not facially unconstitutional under *Heller* and its progeny.

### 2. As-Applied Challenge to Section 29800 Conviction

Defendant additionally contends that section 29800, as applied in his case, violated the Second Amendment because "neither the information nor the evidence elicited at . . . trial proves he fits within a constitutional interpretation of section 29800." According to defendant, he, "like all Americans, had the right to defend himself from threats against his life. Under the Second Amendment, as recently interpreted, this included the right to carry a gun when necessary to do so." He therefore concludes that "the evidence produced at . . . trial is insufficient to establish [he] violated the law, as modified by Second Amendment jurisprudence."

"[A]n 'as applied' challenge may seek 'relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied.'" (*In re D.L.* (2023) 93 Cal.App.5th 144, 157–158.)

The Attorney General argues that defendant forfeited his as-applied challenge by not raising it with the trial court. We agree. (*Zachary H. v. Teri A.* (2023) 96 Cal.App.5th 1136, 1144.)

24

But even if we were to consider the as-applied argument, we would reject it. The jury found defendant guilty of murder and, in doing so, rejected his claim that he was acting in self-defense. Thus, section 29800 could be constitutionally applied to him because the facts showed that he had no right to carry the weapon in self-defense.[8]

D. *Sentencing Error*

Finally, defendant argues that the trial court erred when it imposed an upper term sentence on count 2, felon in possession of a firearm, and the upper term 10-year enhancement on the section 12022.5 gun-use allegation found true in connection with count 1, in violation of his Sixth Amendment rights and section 1170, subdivision (b), which prohibits "imposition of an upper term sentence unless aggravating circumstances justify that term and the facts underlying any such circumstance, other than a prior conviction, 'have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.' (§ 1170[, subd.] (b)(2) . . . .)" (*People v. Lynch* (2024) 16 Cal.5th 730, 742 (*Lynch*).) Where, as

---

[8]    Defendant asserts that to the extent we conclude he forfeited his Second Amendment claim by failing to assert it in the trial court, his trial counsel rendered ineffective assistance. Because section 29800 as applied to defendant did not violate his rights under the Second Amendment, defendant cannot establish that his counsel's failure to raise the issue below was outside the range of professionally competent assistance or that he suffered prejudice as a result of counsel's actions. (*Strickland v. Washington* (1984) 466 U.S. 668, 686, 690–692; *People v. Mai, supra*, 57 Cal.4th at p. 1009.)

here, a court imposes a high term sentence in violation of section 1170, subdivision (b)(2) and the Sixth Amendment, the error "is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements.  If the reviewing court cannot so determine, applying the *Chapman*[9] standard of review, the defendant is entitled to a remand for resentencing."  (*Ibid.*)

The Attorney General concedes that the trial court erred in sentencing defendant to the high terms on count 2 and the section 12022.5 enhancement, but contends that the error was harmless.  We do not find the error here harmless.  The court did not state any reasons for its imposition of a high term sentence on count 2, although it did state that it would order the sentence to run concurrent to the sentence on count 1 because it was "giving [defendant] some mercy."  Nor did the court state its reason for imposing the high term sentence on the enhancement.  We will therefore remand for resentencing on count 2 and as to the gun-use sentence enhancement on count 1.

---

9       *Chapman v. California* (1967) 386 U.S. 18.

## V.  DISPOSITION

Defendant's convictions are affirmed.  Defendant's sentence is reversed, and the cause is remanded for resentencing consistent with this opinion.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM (D.), J.

We concur:

HOFFSTADT, P. J.

BAKER, J.

27